# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

EVOLUTION, INC.,                  )

                                     )

          Plaintiff,          )

                                     )      CIVIL ACTION FILE

vs.                             )

                                     )      NO. 01-2409-CM

SUNTRUST BANK and         )

PREMIUM ASSIGNMENT CORPORATION,  )

                                     )

          Defendants.      )

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION TO EXCLUDE EXPERT REPORT
## AND TESTIMONY OF DONALD J. REIFER

---

RUSSELL S. JONES, JR.
KS Fed #70214
Shughart Thomson & Kilroy, PC
120 West 12th Street, 15th Floor
Kansas City, Missouri 64105
Telephone: 816-421-3355 (switchboard)
Facsimile: 816-374-0509

BRYAN G. HARRISON
GA Bar #331750
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road N.E.
Atlanta, Georgia 30326-1044
Telephone: 404-233-7000
Facsimile: 404-365-9532
Attorneys for Defendants SunTrust Bank and
Premium Assignment Corporation

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................iii

TABLE OF EXHIBITS ......................................................................................................iv

QUESTION PRESENTED ...................................................................................................v

I.     INTRODUCTION...................................................................................................1

II.    SUMMARY OF ARGUMENT ..............................................................................2

III.   STATEMENT OF PERTINENT FACTS...............................................................3

       A.     PREFACE...................................................................................................3

       B.     SUMMARY OF PERTINENT FACTS ......................................................3

              1.     The Parties' Contracts ....................................................................4

              2.     Problems With the PF32 Software .................................................5

              3.     Problems With Data Door................................................................6

              4.     Mr. Reifer's Expert Report ............................................................8

IV.    ARGUMENT AND CITATION OF AUTHORITIES ............................................9

       A.     STANDARD FOR ADMISSIBILITY OF EXPERT
              TESTIMONY ..............................................................................................9

       B.     MR. REIFER IS NOT COMPETENT TO OPINE ON THE
              VALUE OF PF32 BECAUSE, AMONG OTHER FLAWS, HE
              DID NOT EXAMINE THE SOFTWARE PRODUCTS HE
              PURPORTS TO VALUE. ..........................................................................11

       C.     MR. REIFER ADMITS THAT HE ENGAGED IN AN
              INSUFFICIENT ANALYSIS NECESSARY TO VALUATION
              PLAINTIFF'S DDF FILES. .......................................................................17

       D.     MR. REIFER'S OPINION RELATED TO DATA DOOR
              SHOULD BE STRICKEN BECAUSE IT IS SPECULATIVE,
              NOT SUBSTANTIATED BY THE FACTS, AND RESULTS
              IN AN IMPERMISSIBLE LEGAL CONCLUSION. ................................19

#1142833 v2 - ST/daubert/Reiffer

E.      MR. REIFER'S VALUATION OF FOREGONE
        OPPORTUNITIES SHOULD BE STRICKEN BECAUSE IT
        RELATES TO AN UNRECOVERABLE DAMAGE AND IS
        NOT SUPPORTED BY THE UNDERLYING FACTS. ...........................20

V.      CONCLUSION ......................................................................................22

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Claar v. Burlington Northern Railroad Co.,* 29 F.3d 499 (9th Cir.1994) .............................. 11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786,
    125 L. Ed. 2d 469 (1993) .................................................................................. passim

*General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508
    (1997) ..................................................................................................................... 22

*In re Breast Implant Litigation,* 11 F. Supp. 2d 1217 (D. Colo. 1998) ................................ v, 9

*In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717 (3d Cir.1994) ......................................... 10

*Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S. Ct. 1167, 143 L.
    Ed. 2d 238 (1999) .................................................................................................. 9, 13

*Mitchell v. Gencorp Inc.,* 165 F.3d 778 (10th Cir. (Kan.) 1999) ........................... 9, 10, 16, 18

*Ralston v. Smith & Nephew Richards, Inc.* 275 F.3d 965 (10th Cir. (Kan.)
    2001) ....................................................................................................................... v, 9

*Sawyer v. Southwest Airlines Co.,* 243 Fed. Supp. 2d 1257 (D. Kan. 2003) ......................... 19

*Smith v. Ingersoll-Rand Co.,* 214 F.3d 1235 (10th Cir. 2000) ............................................... 19

*Sorensen by and Through Dunbar v. Shaklee Corp.,* 31 F.3d at 638 (8th
    Cir.1994) ................................................................................................................... 10

**FEDERAL STATUTES**

Fed. R. Evid. 702 ........................................................................................................... v, 9, 10

**KANSAS STATUTES**

D. Kan Rule 7.1 ....................................................................................................................... 1

## TABLE OF EXHIBITS

1.      Expert Report of Donald J. Reifer dated June 26, 2003

2.      Deposition Transcript of Donald F. Reifer dated September 25, 2003

3.      Expert Report of Bruce F. Webster dated August 1, 2003

**QUESTION PRESENTED**

Whether the expert testimony of Donald J. Reifer meets the standards for admissibility pursuant to Fed. R. Evid. 702 and the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *Ralston v. Smith & Nephew Richards, Inc.* 275 F.3d 965, 970 (10th Cir. (Kan.) 2001) (citing *In re Breast Implant Litigation,* 11 F. Supp. 2d 1217, 1222 (D. Colo. 1998)).

Pursuant to D. Kan Rule 7.1 and the United States Supreme Court decision in *Daubert v. Merrell*, 509 U.S. 579 (1993), Defendants SunTrust Bank ("SunTrust") and Premium Assignment Corporation ("PAC") (SunTrust and PAC may jointly be referred to as "SunTrust") hereby file their Memorandum of Law in Support of their Motion to Exclude the Expert Report and Testimony of Donald J. Reifer, showing this Court as follows:

## I. <u>INTRODUCTION</u>

This action arises out of SunTrust's acquiring licenses for software that simply did not work as promised and its subsequent attempts to work with the vendor to mitigate its losses. SunTrust provides banking services to its customers. PAC is SunTrust's wholly owned subsidiary that provides financial services to the insurance industry. PAC, on behalf of itself and SunTrust, licensed two software products from Plaintiff. It is undisputed that, despite dozens of attempts over two years, Plaintiff never delivered software or services that met industry standards (or even worked in accordance with the pre-license representations of Plaintiff).

To mitigate their damages, SunTrust and PAC attempted to fix the software themselves and ultimately were forced to convert to software from another vendor. To extract their financial data stored in Plaintiff's program, SunTrust had to create a means of extracting the data and to export it into a replacement software program. Despite overwhelming evidence of the inadequacy of its product and services and its failure to meet industry standards with respect to the same, Plaintiff filed this specious lawsuit claiming Defendants' efforts to mitigate their damages harmed Plaintiff by a ***millions*** of dollars.

In support of its damage claims, Plaintiff intends to rely on the "expert" testimony of Donald J. Reifer.  In his report and deposition testimony, Mr. Reifer offers an opinion of the value of SunTrust's use of Evolution's products and "lost opportunity costs."  As discussed below in more detail herein, Mr. Reifer's report and testimony should be stricken.

## II.  SUMMARY OF ARGUMENT

Mr. Reifer's report and testimony should be stricken for the following reasons:

A.    Mr. Reifer's "expert" opinion on damages is totally speculative, is based upon a flawed methodology, and is, therefore, completely unreliable.  For example, Reifer values products that he admittedly has never seen or used.

B.    Mr. Reifer's opinions are not supported by any competent information, independent analysis or evidence, which further undermines the reliability of such opinions.  Rather, Mr. Reifer relies mostly on unsubstantiated statements by Plaintiff's president Donald Sprowl.  Expert testimony is not necessary for this exercise.  Plaintiff's president can testify for himself.  In other words, Mr. Reifer's opinions are not helpful to the jury.

C.    Mr. Reifer inappropriately makes legal conclusions based on agreements he has never reviewed.  These conclusions invade the province of the jury and reflect that his opinions were result-oriented and therefore unreliable.

D.    Mr. Reifer is not competent to opine on the value of Plaintiff's lost opportunity costs because his specialty is valuing software, not business opportunities. Indeed, Mr. Reifer admits he knows nothing about Plaintiff's business, cannot identify any lost opportunities, and used his own business as the basis for

evaluating what Plaintiff might have lost though the two business have no demonstrated commonality.

E.     Mr. Reifer himself admits that his investigation could have been more thorough and that his valuation method yielded unreasonable values.

## III.  STATEMENT OF PERTINENT FACTS

### A.     PREFACE

The underlying facts giving rise to this action are set forth in detail in Defendants' Motion for Summary Judgment currently pending before this Court.  For purposes of this Motion, Defendants incorporate herein by reference their Statement of Facts set forth therein, which includes a full record citation supporting such facts.  As summary of the key facts relevant to the Court's consideration of this Motion are set forth below.

### B.     SUMMARY OF PERTINENT FACTS

SunTrust provides banking and banking-related services to businesses and consumers throughout the southeastern United States.  SunTrust is a successor-in-interest to SunTrust Services Corporation ("STSC").  PAC is a wholly owned subsidiary of SunTrust.  PAC provides various services to the insurance industry, including financing services for insurance premiums.  SunTrust's role vis-à-vis PAC in this litigation was to manage the installation of Plaintiff's software at PAC and provide ongoing software support after installation.  Plaintiff is in the business of software development.

SunTrust provides banking and banking-related services to businesses and consumers throughout the southeastern United States.  SunTrust is a successor-in-interest to SunTrust

Services Corporation ("STSC").   PAC is a wholly owned subsidiary of SunTrust.   PAC provides various services to the insurance industry, including financing services for insurance premiums.   SunTrust's role vis-à-vis PAC in this litigation was to manage the installation of Plaintiff's software at PAC and provide ongoing software support after installation.  Plaintiff is in the business of software development.

     1.    <u>The Parties' Contracts</u>

SunTrust (formerly STSC), PAC, and Plaintiff are parties to three agreements:

- A License Agreement for Software Services executed on June 30, 1998, which was amended on March 31, 1999, and September 23, 2000 (the "License Agreement").   The March 1999 amendment substituted a license for a financial processing software package known as PF32 for a product known as PF2000.

- A Source License Agreement for Evolution's PF2000 software executed on July 1, 1998, which was amended on March 30, 1999, to apply to the PF32 software (the "Source License").   The Source License gave STSC and PAC certain rights to access and use Plaintiff's source code.

- A Data Door License Agreement executed on September 10, 1998 (the "Data Door License").   The Data Door software was supposed to give STSC and PAC the ability to access data and create customized reports.

The License Agreement states the licensed software is "solely for customers [sic] own internal operations."   The License Agreement also provided for 39 perpetual full-user

licenses and 20 screen-only user licenses, but this was amended to increase the number of user licenses to a total of 44 full-user licenses and 25 screen-only user licenses.

The Source License granted a license for Plaintiff's PF32 source code[1] for use on one computer system at one location.  Under the Source License, STSC and PAC were permitted to use Plaintiff's source code for their own internal purposes.  The Source License also gave STSC and PAC the right to modify Plaintiff's source code.  Generally, STSC and PAC were required to request that Plaintiff make the modifications.  If the modifications were *de minimus*, however, or if Plaintiff could not perform such modifications, then STSC and PAC could modify the source code themselves.

The purpose of the Data Door product was to allow SunTrust and PAC to extract data stored by PF32 to create reports.  The Data Door License permits STSC and PAC to use the Data Door software for their own administrative, accounting or management purposes.

2.      Problems With the PF32 Software

Upon delivery, the PF32 software failed to operate due to problems with the software.  Thereafter, Plaintiff delivered several updates to the software while claiming to fix the software, but it never could.  STSC and PAC also learned Plaintiff's software would not work with Plaintiff's Voice Control System ("VCS") provided to PAC.  VCS is basically a phone interface module that allows a client to use its loan number to search and retrieve

---

[1]  "Source code" refers to human-readable software code used by programmers to develop a software program.  "Object code" is machine-readable code that is a series of 1s and 0s. Source code is converted into object code through a process called "compiling."

information about the status of a loan.  Although later versions of the software fixed some problems, they did not fix VCS.

As a result of the continued problems with the software, STSC and PAC had to develop "workarounds" to utilize Plaintiff's software in their business.  The workarounds, however, were only intended to be a temporary fixes, all of which were supposed to be corrected by Plaintiff.

As a result of Plaintiff's failure to correct the PF32 software, STSC and PAC decided to fix the bugs in Plaintiff's software themselves.  In fixing and stabilizing the software, STSC and PAC made several changes to the PF32 source code.  None of those changes resulted in a change of functionality, but merely corrected bugs within the software.  In sum, STSC and PAC never received a stable version of the PF32 software from Plaintiff.  Rather, the most stable version was the one modified by STSC and PAC to correct software bugs.

　　　　　　　3.　　Problems With Data Door

SunTrust and PAC also encountered problems with the Data Door product. Specifically, in the fall of 1999, PAC experienced severe problems with the reporting functions performed utilizing the Data Door information.   The real issue was the performance of the database, the root cause of which was the excessive number of transaction records the application was creating.  As a result of the creation of these records, ASDNorth, which provided ledger reports using Data Door, developed performance problems.  Reports that initially took less than a minute to prepare and print were now taking between 10 and 15 minutes.

#1142833 v2 - ST/daubert/Reiffer

To solve this problem, PAC and STSC developed a new program for PAC's reporting needs called MIDAS (a/k/a CLSP01).  MIDAS was developed primarily to provide PAC with the ability to generate a ledger print.  SunTrust and PAC utilized certain literal elements from Plaintiff's PF32 source code in their development of MIDAS.  Specifically, STSC and PAC used what are known as "calls."  Generally speaking, these are low-level software programs that access data and bring it to another program.  Here, STSC and PAC developed higher-level programs using combinations of Plaintiff's calls to retrieve the data from PAC's database, as opposed to writing individual calls to retrieve such data.  In other words, the software developed using Plaintiff's code was merely to extract data and print reports with it or insert it into a Microsoft Access database.

Going through this extraction process also required the creation of DDF interface files because Plaintiff's DDF files did not work.  Significantly, Plaintiff provided STSC and PAC with the information necessary to create the new DDFs.

Ultimately, SunTrust and PAC decided to change vendors.  As a result, STSC and PAC needed to extract PAC's data stored by Plaintiff's software to convert it for use in the replacement software.  This process involved the creation of ABCNotes, LNSNotes, and QTR.exe.  These are programs were written for a single use to extract information about PAC business contacts and loans to be converted to another system.  All source code written for LNSNotes, ABCNotes, and QTR.exe were solely for extraction of data for the conversion process.

During their access to and use of Plaintiff's software, STSC or PAC never disclosed any of Plaintiff's information, whether source code or other trade secrets, to any third party,

including their new vendor.  Stated another way, there is no evidence that STSC or PAC ever accessed or used Plaintiff's software for any purpose other than for internal purposes.

As a result of SunTrust and PAC's corrections to the PF32 software, development of MIDAS using limited "calls", and development of limited-use data extraction programs, Plaintiff filed this lawsuit alleging breach of contract, copyright infringement, tortious interference and misappropriation of trade secrets.

4.    Mr. Reifer's Expert Report

Plaintiff retained Mr. Reifer to examine and value its claims concerning SunTrust's use of its software at issue in this lawsuit.  Reifer Report at 1, attached as Exhibit "1." Plaintiff asked Mr. Reifer to value (1) SunTrust's use of Evolution's PF32 software to generate reports in SunTrust's MIDAS Software; (2) SunTrust's use of Evolution's Software when it created DDFs for use with new software; (3) SunTrust's use of Data Door to create a derivative work; and (4) Plaintiff's opportunity costs foregone because of its focus on this lawsuit.  *Id.*  Using a methodology that has no basis in reality and applying facts that are unsubstantiated, Reifer manufactured the following valuation:

| | |
|---|---|
| Unauthorized Use of PF 32 software | $445,682 |
| Unauthorized Use of DDFs | $2,032,822 |
| Unauthorized Use of Data Door | $252,635 |
| Opportunity Costs | $1,270,627 |
| TOTAL | $4,001,766 |

This Court should strike Mr. Reifer's report in its entirety because it is arbitrary, speculative, not supported by any evidence or independent analysis, and is therefore not helpful to the jury.

- 8 -

## IV.  ARGUMENT AND CITATION OF AUTHORITIES

### A.    STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

Plaintiff has the burden of proving that the opinions of its expert witnesses are admissible pursuant to Fed. R. Evid. 702 and the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *Ralston v. Smith & Nephew Richards, Inc.* 275 F.3d 965, 970 (10th Cir. (Kan.) 2001) (citing *In re Breast Implant Litigation,* 11 F. Supp. 2d 1217, 1222 (D. Colo. 1998)).  Federal Rule of Evidence 702 allows the parties to present scientific testimony through a qualified expert where such evidence "will assist the trier of fact to understand the evidence or to determine a fact in issue."  *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. (Kan.) 1999).

Fed. R. Evid. 702 imposes upon the trial judge an important "gate-keeping" function with regard to the admissibility of expert opinions.  *Daubert,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469.  To determine whether an expert opinion is admissible, courts undergo a two-step analysis.  First, courts have to determine whether the expert was qualified by "knowledge, skill, experience, training, or education" to render an opinion. *See* Fed. R. Evid. 702.  Second, if the expert is so qualified, the court determines whether his opinions are "reliable" under the principles set forth under *Daubert,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469, and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

Scientific knowledge "implies a grounding in the methods and procedures of science" which must be based on actual knowledge and not "subjective belief or unsupported speculation."  *Mitchell,* 165 F.3d at 780 (citing *Daubert*, 509 U.S. at 590, 113 S. Ct. 2786).

In other words, "an inference or assertion must be derived by the scientific method . . . [and] must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Id.* The Supreme Court also suggested that the trial court should consider a theory's susceptibility to testing and whether the theory has been subjected to such testing. *Id.* at 593, 113 S. Ct. 2786.

Under *Daubert,* "any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Mitchell*, 165 F.3d at 782 (citing *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 745 (3d Cir.1994)). When analytical gaps in experts' opinions are too broad for their testimony to endure under the strictures of *Daubert* and Rule 702, the district court should find that the expert's opinions are not reliable. *See Mitchell*, 165 F.3d at 783.

Under *Daubert,* the "subject of an expert's testimony must be 'scientific . . . knowledge'. The adjective scientific implies a grounding in the methods and procedures of science." *Mitchell*, 165 F.3d at 783, citing *Daubert,* 509 U.S. at 589-90, 113 S. Ct. 2786. "Scientific method today is based on generating hypotheses and testing them to see if they can be falsified. . . ." *Id.* at 593, 113 S. Ct. 2786. In one case, the district court found that two experts reached their ultimate conclusions before studying the available literature. "[This type of action] turns scientific analysis on its head. Instead of reasoning known facts to reach a conclusion, the experts here reasoned from an end result in order to hypothesize what needed to be known but what was not." *Sorensen by and Through Dunbar v. Shaklee Corp.,* 31 F.3d at 638, 649 (8th Cir.1994). "[S]cientists whose conviction about the ultimate

conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests [may] properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method."   *Claar v. Burlington Northern Railroad Co.,* 29 F.3d 499, 503 (9th Cir.1994).

In the instant case, the following argument will demonstrate that Mr. Reifer's report, methodology and opinions do not pass muster under the requirements of *Daubert* and its progeny.

**B.     MR. REIFER IS NOT COMPETENT TO OPINE ON THE VALUE OF PF32 BECAUSE, AMONG OTHER FLAWS, HE DID NOT EXAMINE THE SOFTWARE PRODUCTS HE PURPORTS TO VALUE.**

Despite admitting that he never reviewed the parties' license agreements, never reviewed a line of code for any of the software programs at issue, and did not understand or study the legal issues concerning the dispute, Mr. Reifer inappropriately made the legal conclusion that SunTrust violated its license agreement for the PF 32 Software.   Regardless of expertise, it is fundamentally impossible to value software with any reasonable certainty without examining the software.   Webster Report at 20, attached as Exhibit "3."   Instead, Mr. Reifer *assumes* that all 9,963 lines of code were of value, necessary and used within the MIDAS code and opines that "large sections of the PF32 code appear verbatim without modifications and alterations."   Reifer Report at 4. The undisputed evidence, however, reveals that SunTrust used only a small portion of the code.

Using the COCOMO II[2] method of valuation, Reifer values the cost to create the *entire* PF32 source code at $188,072. Reifer Report at 6. The COCOMO II valuation method uses five scale factors to rate how well an organization can develop software. These scale factors have a relatively large impact on the effort estimate because their sum is used as the exponent to which size is raised. Reifer Report at 11. The five factors look at whether (1) the system been built before; (2) the requirements are strict or flexible; (3) the architecture is stable and risks have been mitigated; (4) the complexity of team interaction; and (5) the maturity of the processes used. *Id.* at 11–12. The method also looks at 17 "cost drivers" to assess the relative impact of a variety of factors on effort and duration. *Id.* at 12. Mr. Reifer admits that he is unaware of any court ever having approved of the COCOMO II model for determining the value of a software program. Reifer dep. at 94, attached hereto as Exhibit "2."

In his deposition, Mr. Reifer made the following admissions, any one of which calls into question the reliability of his opinions:

- Mr. Reifer relied solely on discussions with Mr. Sprowl for his self-serving version of events. *Id.* at 22, 33–34, 41, 63. Mr. Reifer admits he did nothing to verify that what Mr. Sprowl told him was in fact accurate or even colorably accurate. *Id.* at 33, 41. In other words, although Mr. Reifer purports to use this scale to rate Plaintiff, in reality he knows nothing about Plaintiff because he performed no independent analysis of this company.

---

[2] COCOMO II is an acronym for constructive cost modeling. According to Reifer, COCOMO is a set of mathematical formulas used for estimating software development project effort and duration.

- Despite the fact that Mr. Reifer had no idea whether Plaintiff followed written requirements when writing the PF32 code, he rated the software inflexible. Reifer dep. at 66.

- Mr. Reifer reviewed no documents reflecting that Plaintiff conducted design reviews, but yet he still rated the architecture component.  He did so despite the fact that there is no evidence as to setting any schedules for budgets or internal milestones or evidence of any of the parties' agreements.  *Id.* at 67.

- Mr. Reifer has no idea what percentage of Plaintiff's development schedule was devoted to design, who the software architects were, whether Plaintiff had any tool support for resolving risk or for developing and verifying architectural specifications.  Mr. Reifer has no idea as to the uncertainty of the key architectural drivers for the PF32 code.  *Id.* at 68.

- Mr. Reifer never spoke to the developers of PF32 and admits he could "have done a much more thorough job in rating."  *Id.* at 69 (emphasis added).

- Mr. Reifer admits he has no idea about Evolution's customers or its relationship with them.  *Id.* at 69–70.

- Mr. Reifer admits that he did not go through a full formal methodology because it "would have taken weeks" and "is a very expensive proposition." *Id.* at 71.

- Mr. Reifer admits that he could not determine whether the PF32 code was straightforward or complex because he *never* looked at the code.  *Id.* at 81. Instead he relied on Plaintiff's staff to rate the code.[3]

- Mr. Reifer admits that he rated PF32's volatility without knowing what operating system it was designed for.  *Id.* at 85.

- Mr. Reifer rated Plaintiff's analysts capability high without ever interviewing any of the analysts.  *Id.* at 85–86.

- Mr. Reifer has no idea how long Plaintiff has been in business and has no idea whether Plaintiff's analysts performed the same functions as the programmers. *Id.* at 87.

---

[3] Similarly, it was the failure to examine the original tire, instead relying on a colleagues examination, that doomed the expert witness in and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

- • Mr. Reifer rated Plaintiff as if it had low turnover without ever having reviewed Evolution's personnel records and admits he could have "dug deeper." *Id.* at 89. He rated Evolution has having very high in terms of experience, but has no idea who the team was who developed PF32. *Id.* Mr. Reifer had no idea how the support team communicated with each other or the customer. *Id.* at 92–93.

- • Mr. Reifer admits that he had to review what best practices were for valuing software by researching on the Internet, but that he did not fully understand the materials he reviewed. Reifer dep. at 10, 15.

- • Notably, Mr. Reifer admits that the line count for which he charges SunTrust includes "dead code," that is, code that never executed. He admits that he never reviewed the MIDAS code to see what aspects of it were dependent on PF32 code. *Id.* at 21. Of course, it would not have done Reifer any good to review MIDAS' code because he never reviewed PF32's code either so he would not have recognized any possible iterations of it in the MIDAS Code. *Id.* at 34, 45.

- • Wholly absent from Mr. Reifer's report is any analysis of Plaintiff as a company or its employees.

- • Mr. Reifer does not know when the code was written, how long it took to create or develop, how much it cost to develop, or what language it was written in. *Id.* at 43–44.

- • Mr. Reifer admits he has no idea how long it took for SunTrust to develop MIDAS. *Id.* at 47.

- • Mr. Reifer appears to have done his analysis under the mistaken impression that PF32 actually functioned for SunTrust before MIDAS was created. *Id.* at 48.

- • Mr. Reifer did not count the lines of the source code himself and does not know which version of PF32 Plaintiff used when it counted the lines. *Id.* at 96.

In stark contrast to Mr. Reifer's superficial and result-oriented method of valuing Plaintiff's products, SunTrust's expert, Bruce Webster, a software engineer with over 30 years of experience, describes the basic elements of due diligence when valuing software that Mr. Reifer ignored, including (1) examining the source code and assessing its quality and

operation; (2) examining the architecture's flexibility and sustainability; (3) determining what portion of the technology is truly proprietary and actually results in a competitive advantage in the marketplace; (4) assessing the actual expertise of the technical staff and support personnel and Plaintiff's likelihood of retaining stable workforce; (5) reviewing the company's overall product history and track record and retention history; (6) reviewing Plaintiff's sales figures and financial history; and (7) the transferability of the product to other platforms and technologies.  Webster Report at 3.

Mr. Webster's report reveals serious flaws in Mr. Reifer's methodology for valuing Plaintiff's products, including the following:

- Mr. Reifer ignored the fact that Plaintiff had shrunk to a very small size between 1994 and 1998.  Webster Report at 7.

- At the inception of the parties' relationship, Plaintiff doubled its size, which is particularly disruptive in a small technology company.  Webster Report at 9.

- Plaintiff used the cheapest software developers it could find as its employees were in the bottom ten percent for salary of all programmers.  Webster Report at 9.

- Mr. Reifer ignored the fact that PF32 had so many issues it effectively was worthless.  Webster Report at 13–14.

- PF32 was so worthless that Evolution abandoned it and is now marketing a different product.  (Webster at 12).

With regard to the substance of the alleged copying, Mr. Reifer ignores that nothing is proprietary or encrypted about the BTRIEVE database used by SunTrust—undisputedly the only portion of PF32 that SunTrust used.  Mr. Reifer also ignores that several third-party tools exist to examine databases and produces DDFs.  Webster Report at 19.

#1142833 v2 - ST/daubert/Reiffer

With regard to the time required to develop MIDAS, Mr. Reifer used a formula to determine that it would take a maximum of 11.8 months to replace the entire 9,972 lines of code. Mr. Reifer, however, ignores unrebutted testimony by the persons who wrote MIDAS that without the PF32 BTRIEVE code, creating MIDAS would have only taken a few more weeks. Manual conversion was not the only option available to SunTrust. (*Id*.; Baddoo dep. at 126–27). Even taking Mr. Reifer's estimate of 11.8 months as true, that would still have only cost Plaintiff the actual annual salary of one of its employees—its highest paid programmer made under $32,000. Webster Report at 9.

Finally, Mr. Reifer asserts that SunTrust failed to pay $257,610 in license fees for 109 users for the year during which SunTrust created MIDAS. Reifer Report at 7. Mr. Reifer, however, admits that he has no idea when or how SunTrust paid its license fees. Reifer dep. at 51. Regardless, Mr. Reifer's assertion that PF32 had 109 users is incorrect. Only 44 users could use PF32 at one time because of an internal control in the software. Webster Report at 22. Simply put, Mr. Reifer's opinion regarding the value of PF32 lacks a sufficient basis.

In sum, Mr. Reifer failed to conduct an independent analysis and made assumptions of fact that are incorrect at worst and misleading at best. This has led to an opinion that is arbitrary and speculative, which is insufficient to past the *Daubert* test. *Mitchell,* 165 F.3d at 780, 783 (citing *Daubert*, 509 U.S. at 590, 113 S. Ct. 2786). As such, Mr. Reifer's report and testimony should be stricken.

## C.   MR. REIFER ADMITS THAT HE ENGAGED IN AN INSUFFICIENT ANALYSIS NECESSARY TO VALUATION PLAINTIFF'S DDF FILES.

Without any basis in fact, Mr. Reifer attempts to support Plaintiff's claim that SunTrust violated the license agreement by creating DDF files to extract data for use in SunTrust's new software.  This use purportedly allowed SunTrust quickly and efficiently to transition to the other software.  Without the DDF files, Mr. Reifer claims that SunTrust otherwise would have had to convert the database manually, which he concludes without any evidence would have been very costly.  Reifer Report at 1.

To value Plaintiff's DDFs, Mr. Reifer estimated SunTrust's "profits" from using the DDFs and added that to the estimate of the lost license fees.  *Id.* at 7.  To compute the profit, Mr. Reifer examined what he believed to be the alternatives available to SunTrust.  He determined that manual conversion was an option that would have required SunTrust to continue licensing Plaintiff's software.  Mr. Reifer estimated that a manual conversion would have taken 20 minutes per each customer record, which he states is $125,000.  Using an arbitrary $90 per hour, he calculates that manual conversion would cost $3,750,000.  (*Id.* at 8).  By analogy, Mr. Reifer's theory is the same as attempting to calculate the value of a single license of Microsoft Word based on the number of documents to be processed by Microsoft Word.

Mr. Reifer then states that the effort could have been reduced considerably by hiring Plaintiff to develop utilities to expedite performing the conversion automatically at a cost of $250,000.  This option required an unsubstantiated one minute per record conversion time at the rate of $90 per hour, costing and additional $187,500.  The total for this option was

$437,500.  *Id*.  Mr. Reifer then decides that it is "fair" to value the use of the DDFs by taking the average of the preceding two calculations to estimate the "profits" at $2,032,822.  *Id*.

At deposition, Mr. Reifer admitted that he never reviewed the BTRIEVE database at issue and never reviewed the DDFs that he purports to value.  *Id*. at 51–52.  Mr. Reifer made his opinion while ignorant of the fact that the DDFs delivered by Plaintiff were for the wrong product and that SunTrust worked together with Plaintiff to develop PF32's DDFs.  *Id*. at 37.  Mr. Reifer also acknowledged that he never analyzed the cost of developing DDFs using the preprocessor method and that doing so would require significant additional investigation that he has not performed.  *Id*. at 52.  Mr. Reifer also admitted that he has never heard of anyone doing the manual conversion for 125,000 records that he suggested was somehow appropriate.  *Id*. at 54.  Importantly, Mr. Reifer himself <u>admits that the value he came up with was completely unreasonable</u>.  *Id*. at 54.  Mr. Reifer's method of making it more reasonable was to average his unreasonable number ($3.75 million) with the significantly lower number from his alternative calculation ($400,000).  This is a wholly arbitrary calculation.

Significantly, Mr. Reifer also admitted that had he known that SunTrust worked on the DDFs with Plaintiff, his entire opinion would change.  Reifer Report at 56.  In other words, as with his opinion related to PF32, Mr. Reifer's opinion is arbitrary and speculative, and should thus be stricken.  *See Mitchell,* 165 F.3d at 780, 783 (citing *Daubert*, 509 U.S. at 590, 113 S. Ct. 2786).

**D. MR. REIFER'S OPINION RELATED TO DATA DOOR SHOULD BE STRICKEN BECAUSE IT IS SPECULATIVE, NOT SUBSTANTIATED BY THE FACTS, AND RESULTS IN AN IMPERMISSIBLE LEGAL CONCLUSION.**

In opining on a legal conclusion, Mr. Reifer asserts that SunTrust violated its license agreements by modifying Evolution's Data Door Product so that DDFs could be interfaced with SunTrust's new software. Mr. Reifer claims that in doing so, SunTrust created a derivative work, which was used to build other products to process loan data. Mr. Reifer asserts that SunTrust's only other option was to hire Plaintiff to modify the code. To value the Data Door product, Mr. Reifer calculates the income lost in software development fees and maintenance fees for five years.

Mr. Reifer's opinion is initially flawed because it opines on a question of law, i.e., whether SunTrust violated its license by creating a derivative work. Expert testimony is improper for a question of law. *Smith v. Ingersoll-Rand Co*., 214 F.3d 1235, 1246 (10th Cir. 2000); *Sawyer v. Southwest Airlines Co*., 243 Fed. Supp. 2d 1257, 1268-69 (D. Kan. 2003).

To calculate this amount, Mr. Reifer used Plaintiff's estimate that it would take one of its "senior people" an entire year to produce software with similar capabilities. Mr. Reifer estimates this person's annual salary at $189,696 assuming he worked 152 hours per month at $104 per hour. Mr. Reifer assumed maintenance fees at 10 percent of the development cost for a 5-year total of $75,880. In total, Mr. Reifer valued the unusable Data Door product at $252,635. (Reifer Report at 9).

In his deposition, Reifer admitted that he had no idea how long it took to create the purportedly derivative product. Reifer Dep. at 57. He also admits that his only basis for assuming that it would take a senior analyst a year to create the product was that Mr. Sprowl

told him it would.  *Id.*  In other words, Mr. Reifer conducted no independent analysis.  At trial, Mr. Sprowl can testify for himself.  Importantly, Mr. Reifer acknowledged that his opinion would need to be reevaluated if he had information concerning the actual time it took to create the product.  *Id.* at 58.  Mr. Reifer also admits he has no idea whether Plaintiff has other clients who use Data Door.  *Id.* at 58.

Mr. Webster notes that Mr. Reifer ignores a fundamental fact about Data Door—the product never worked.  Webster Report at 24.  Indeed, Plaintiff appears to have removed all mention of Data Door from its website.  *Id*.  Also, the DDFs, which are the only part of Data Door that SunTrust utilized, have minor value at best because third-party software could very easily be used to extract SunTrust's files.  *Id.*  The failure of Mr. Reifer to consider these facts renders his report unreliable.  *See Mitchell*, 165 F.3d at 783.

**E.    MR. REIFER'S VALUATION OF FOREGONE OPPORTUNITIES SHOULD BE STRICKEN BECAUSE IT RELATES TO AN UNRECOVERABLE DAMAGE AND IS NOT SUPPORTED BY THE UNDERLYING FACTS.**

Plaintiff claims that it sacrificed numerous lucrative business opportunities to pursue SunTrust for license agreements.  Though no specific lost business opportunities are mentioned, Mr. Reifer states that "[d]uring the time it took me to prepare this report, [an unnamed] principal from Evolution worked almost full time preparing materials for the case. . . ."  Reifer Report at 10.  "Instead of focusing on acquiring new business, they used their time to meet with and provide inputs to the lawyers and to find relevant precedent to support their claims."  *Id.*

As a preliminary matter, there is no claim in this lawsuit for which such damages could be awarded.  Plaintiff is basically seeking damages for its unilateral decision to drop its business in favor of prosecuting this lawsuit.  SunTrust is unaware of any legal basis to recover damages for a party's time spent on a lawsuit.

Nonetheless, to value this theory of recovery, Mr. Reifer assumed that one senior analyst worked half-time for two years.  Reifer viewed this time estimate as "conservative" and "reasonable" but cites to no comparators.  He bills the analyst at $135 per hour (with a 5% salary increase for year two) and simply guesses that the otherwise occupied analyst would have generated additional licenses at five times the effort expended, which he estimates at $648,000 and $680,400 for a total of $1,270,488.

At deposition, Mr. Reifer admits he cannot identify a single customer that Plaintiff did not get because it was pursuing the lawsuit.  Reifer dep. at 59.  Mr. Reifer further admits that he does not have actual figures concerning how much time has actually been spent preparing for the lawsuit.  *Id*. at 59–60.  Outrageously, Mr. Reifer's estimate of the value of undeveloped products was not even based on Plaintiff's historical license generation, but rather his own.  *Id.* at 61.  Mr. Reifer used his own experience despite the fact that he had no basis for drawing a parallel between his own activities and Plaintiff's, and has never developed software in the premium finance industry.  *Id.*  Mr. Reifer has never reviewed Plaintiff's sales or market statistics, and is simply aware of nothing that would support his estimate.  *Id.* at 61.

As noted by Mr. Webster, Plaintiff's payroll for the entire company for 2001 was $263,430.24.  Mr. Reifer's calculations were based on an analyst who made $135 per hour,

which works out to $270,000 per year.  In other words, the hypothetical analyst used by Mr. Reifer makes more in salary than the entire Evolution staff.  Webster report at 24–25. This makes no sense.   Furthermore, Mr. Reifer's expectation that Plaintiff's imaginary employee would bring in five times his "salary" is wholly unrelated to how Plaintiff actually performed in the years it did business.  *Id.*  In sum, because Plaintiff cannot recover any damage for foregone opportunities, this part of Mr. Reifer's opinion cannot, as a matter of law, "assist the trier of fact to understand the evidence or to determine a fact in issue."  *See Mitchell*, 165 F.3d at 780.  As a result, Mr. Reifer should not be permitted to testify on the foregone opportunity issue.

## V.  <u>CONCLUSION</u>

Mr. Reifer's expert report and testimony is not based upon a reliable foundation. Rather, it is based on nothing more than the self-serving statements of Mr. Sprowl.  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) (stating that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert.").  Here, there is simply too great an analytical gap between the data Mr. Reifer relied upon and the opinion he offered.  Mr. Reifer's opinions and testimony are nothing more than subjective belief or unsupported speculation.

WHEREFORE, Defendants SunTrust and PAC respectfully request that Mr. Sherwood's expert report and testimony be stricken.

This 3rd day of May, 2004.

Respectfully submitted,

/s/ Russell S. Jones, Jr.
RUSSELL S. JONES, JR.
KS Fed #70214
Shughart Thomson & Kilroy, PC
120 West 12th Street, 15th Floor
Kansas City, Missouri 64105
Telephone:  816-421-3355 (switchboard)
Facsimile:  816-374-0509

BRYAN G. HARRISON
GA Bar #331750
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road N.E.
Atlanta, Georgia  30326-1044
Telephone:  404-233-7000
Facsimile:  404-365-9532

Attorneys for Defendants SunTrust Bank and Premium Assignment Corporation

#1142833 v2 - ST/daubert/Reiffer

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of May, 2004, a true and correct copy of the foregoing document was filed electronically via CM/ECF in the United States District Court for the District of Kansas, with notice of same being electronically served by the Court, addressed to:

> Lance Y. Kinzer, Esq.
> Schlagel, Damore & Gordon, LLC
> 201 East Loula Street
> P.O. Box 10
> Olathe, Kansas 66051-0010

/s/ Russell S. Jones, Jr.
RUSSELL S. JONES, JR.
KS Fed #70214
Shughart Thomson & Kilroy, PC
120 West 12th Street, 15th Floor
Kansas City, Missouri 64105
Telephone:  816-421-3355 (switchboard)
Facsimile:  816-374-0509

BRYAN G. HARRISON
GA Bar #331750
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road N.E.
Atlanta, Georgia  30326-1044
Telephone:  404-233-7000
Facsimile:  404-365-9532

Attorneys for Defendants SunTrust Bank and Premium Assignment Corporation